UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
In re:

       Michael Maidan,
       dba Grand Avenue Building II, LLC,         Chapter 11
       dba East End Ventures LLC,
       dba 1907 Harrison Realty LLC,         Case No.: 8-19-77027-LAS
       dba 550 Metropolitan LLC,
       dba 62 Grand Ave LLC

                Debtor.
------------------------------------------------------------------x
ERIC HUEBSCHER, AS LITIGATION
TRUSTEE AND CO-LIQUIDATOR FOR
EAST END VENTURES, LLC, EAST END
VENTURES II LLC, AND EAST END
VENTURES III LLC, and ALEXANDER
TALEL, TEMPORARY ADMINISTRATOR
OF THE ESTATE OF EMIL TALEL, as
COLIQUIDATOR for EAST END VENTURES
LLC, EAST END VENTURES II LLC, and        Adv. Proc. No. 8-23-08017-LAS
EAST END VENTURES III LLC,

              Plaintiffs,

v.

JAY BIALSKY, SAG HARBOR
DEVELOPMENT HOLDINGS LLC, JAB SH
HOLDINGS LLC, AND JAB 2 WEST
WATER STREET LLC,

             Defendants.
------------------------------------------------------------------x

## MEMORANDUM DECISION AND ORDER
## ON CROSS MOTIONS FOR SUMMARY JUDGMENT

Before the Court are the cross-motions for summary judgment pursuant to Rule 56 of

the Federal Rules of Civil Procedure, made applicable by Rule 7056 of the Federal Rules of

Bankruptcy Procedure, filed by (i) Plaintiff Eric Huebscher (the "Trustee"), the litigation

trustee under the confirmed plan in the above-captioned chapter 11 case of Michael Maidan

(the "Debtor") and court-appointed co-liquidator of East End Ventures LLC, East End

1

Ventures II LLC, and East End Ventures III LLC (collectively, "East End Ventures"), and Intervening Plaintiff Alexander Talel ("Intervening Plaintiff" and, together with the Trustee, "Plaintiffs") as administrator of the estate of Emil Talel and co-liquidator of East End Ventures [Dkt. No. 80] [1], and (ii) Defendants Jay Bialsky ("Bialsky), Sag Harbor Development Holdings LLC ("Sag Harbor" or the "Company"), JAB SH Holdings LLC ("JAB SH"), and JAB 2 West Water Street LLC ("JAB 2 West Water") (together with Bialsky, Sag Harbor, and JAB SH, "Defendants") [Dkt. No. 92].

## BACKGROUND[2]

### I.    SAG HARBOR REAL ESTATE DEVELOPMENT PROJECT

Debtor was a real estate developer who did business as the sole member or owner of, or held financial interests in, several limited liability companies, including East End Ventures.[3] [Dkt. No. 75 at 3.] Debtor owned 50% of the membership interests of East End Ventures; the other 50% was held by the estate of Emil Talel, represented by its administrator, Alexander Talel, as successor executor to former executor Bernard Jaffe. [*Id.*] Defendant Bialsky has been in the business of buying, selling, and developing real estate in the Hamptons and surrounding area since 1994. [*Id.*] Bialsky's construction company, Chateau Construction, LLC ("Chateau"), has constructed over thirty high-end residential homes and commercial properties during this period. [*Id.*]

---

[1] Unless otherwise stated, citations to docket entries in the adversary proceeding *Huebscher, et al. v. Bialsky, et al.*, Case No. 8-23-08017-las, are cited as "[Dkt. No. ___]", and citations to docket entries in the Chapter 11 bankruptcy case *In re Michael Maidan*, Case No. 8-19-77027-las, are cited as "[Bankr. Dkt. No. ___]".

[2] The material facts are either uncontested, not the subject of genuine dispute, or subject to judicial notice by this Court. Additionally, the relevant background is detailed in this Court's prior decision denying Plaintiffs' request for an order of attachment and are important to understanding the context for this adversary proceeding. [*See* Dkt. No. 75 at 3-7.]

[3] East End Ventures is currently in dissolution, and the Trustee and Intervening Plaintiff have been duly appointed by this Court as co-liquidators to liquidate and distribute the assets of East End Ventures. [*Id.* at 3 n.3.]

East End Ventures and Defendant JAB SH[4] are members of Sag Harbor—a real estate venture established for the purpose of developing residential properties in the Village of Sag Harbor (the "Village"). [*Id.*] The properties in the Village consist of four adjoining waterfront parcels—three parcels on Ferry Road ("Ferry Road") and one parcel on West Water Street ("2 West Water Street").[5] [*Id.*] Sag Harbor, East End Ventures, and JAB SH entered into the Amended and Restated Limited Liability Company Operating Agreement of Sag Harbor Development Holdings LLC (the "Sag Harbor Operating Agreement" or "SHOA") on April 19, 2018. [*Id.*] Debtor and Emil Talel, through their shared ownership of East End Ventures, held a 40% interest in Sag Harbor; Bialsky held the remaining 60% interest in Sag Harbor. [*Id.* at 4.] Section 4.1 of the Sag Harbor Operating Agreement establishes Bialsky as the Manager of the Company, and Section 4.2 sets forth the powers of the Manager. [*Id.*; *see also* SHOA §§ 4.1, 4.2.] Section 6.3 sets out the Members' capital accounts, listing Bialsky's initial capital contribution at $6,480,847.56. [*See* SHOA § 6.3.] Bialsky made at least one more contribution of $500,000 on February 27, 2023. [Dkt. No. 75 at 19 n.14.] Section 7.3 governs distributions to Members of the Company and sets forth a waterfall of payments in connection therewith. [*See* SHOA § 7.3.] Section 7.8 and corresponding Exhibit B set forth two buyout options—Option A and Option B—that the Manager may elect to exercise. [*See* SHOA § 7.8.]

The real estate development project (the "Sag Harbor Project") involves the sale and construction of three properties.[6] Compl. ¶ 35. The first, "Unit A," was intended to be used as Bialsky's family residence. [*Id.*; Dkt. No. 51 at 16]. Construction on Unit A concluded on

---

[4] Bialsky formed JAB SH, a single member LLC solely owned by him, for the purpose of taking ownership of his interest in Sag Harbor. [*Id.* at 3 n.4.]

[5] Defendant JAB 2 West Water is the wholly owned subsidiary of Sag Harbor and the title holder of the 2 West Water Street property. [*Id.* at 3 n.5.]

[6] The Sag Harbor Operating Agreement refers to these properties as Units "1, 2, and 3," which were later changed to Units "A, B, and C" in the Complaint. [*See* SHOA Ex. B; Compl. ¶ 35.]

March 9, 2023, and on April 14, 2023, Bialsky purchased and took title to Unit A by way of deed from JAB 2 West Water. [Dkt. No. 51 at 16-17.] The second, "Unit B," was initially listed at a sale price of over $24 million[7] on or about August of 2019, and it has not yet been sold. [Dkt. No. 80 at 16; Dkt No. 92 at 16-17; Aug. 22 Hr'g Tr. 21:16.] Lastly, Michael Hirtenstein purchased "Unit C" in July of 2021 for $15,003,789. [Compl. ¶ 35; *see also* Dkt. No. 51 at 15.] Unit C was unfinished when Hirtenstein purchased it—he assumed responsibility for all interior work, including but not limited to plumbing, electrical, flooring, HVAC, and drywall installations. [*See* Dkt. No. 51 at 16]. JAB 2 West Water remained responsible for certain exterior work, and escrows totaling over $750,000 were held pending completion of other post-closing work. [*Id.*] Outstanding issues remain with the owner of "Unit C." [Dkt. No. 99 at 36-38; Dkt. No. 92 at 40; D. SOF at 23-24; Aug. 22 Hr'g Tr. 21:16-17.]

## II.    DEBTOR'S CHAPTER 11 CASE

On October 11, 2019, Debtor filed a voluntary petition pursuant to chapter 11 of the Bankruptcy Code.[8] [*See* Dkt. No. 75 at 4; *see also* Bankr. Dkt. No. 1.] Debtor filed an amended disclosure statement (the "Amended Disclosure Statement") and plan (the "Amended Plan") on January 14, 2021. [*See* Dkt. No. 75 at 4; *see also* Bankr. Dkt. No. 135, 136.] The Court entered an order confirming the Amended Plan (the "Confirmation Order") on March 17, 2021. [*See* Dkt. No. 75 at 4; *see also* Bankr. Dkt. No. 149.]

The Amended Plan, among other things, (i) establishes a litigation trust (the "Litigation Trust") for the benefit of the holders of Class 4 (General Unsecured) Claims, (ii)

---

[7] Plaintiffs' Complaint states that Unit B's listing price was $24,950,000. Compl. ¶ 35. In their opposition to Plaintiffs' motion for attachment and motion for summary judgment, Defendants state the listing price was $24,995,000. [Dkt. No. 51 at 25; Dkt. No. 92 at 17]. Plaintiffs have the listing price as $24,500,000 in their motion for summary judgment. [Dkt. No. 80 at 25 n.23.]

[8] All statutory references to sections of the United States Bankruptcy Code, 11 U.S.C. § 101 et seq., will hereinafter be referred to as "§ (section number)."

4

provides for the vesting of the Debtor's Causes of Action (as defined in the Amended Plan) in the Litigation Trust as of the Effective Date, (iii) provides that the Trustee of the Litigation Trust has absolute discretion to determine whether to bring, settle, release, compromise or enforce such Causes of Action, and (iv) provides that the Trustee has the authority to pursue such litigation claims in accordance with the best interests of the Litigation Trust. [Dkt. No. 75 at 4; *see also* Bankr. Dkt. No. 136, Art. XI, 11.1.] The Confirmation Order approved the retention of the Trustee as the Litigation Trustee of the Litigation Trust. [Dkt. No. 75 at 4; *see also* Bankr. Dkt. No. 149 ¶ 4.] The Effective Date under the Amended Plan occurred on or around March 18, 2021. [Dkt. No. 75 at 5; *see also* Bankr. Dkt. No. 136, Art. I, 1.26.]

On May 19, 2021, the Court entered an order modifying Debtor's Amended Plan pursuant to 11 U.S.C. § 1127(b), which appointed the Trustee (i) as the Distribution Agent and the Disbursing Agent for Class 4 (General Unsecured) Claims and (ii) the Debtor's sole administrator and representative of the Debtor's estate pursuant to Section 1.6 of the Litigation Trust Agreement with respect to all assets to be sold or liquidated pursuant to the Plan. [Dkt. No. 75 at 5; *see also* Bankr. Dkt. No. 166.]

### III.    THE ADVERSARY PROCEEDING

The Trustee commenced this adversary proceeding on March 8, 2023. [Dkt. No. 75; *see also* Dkt. No. 1 ("Compl.").] In the Complaint, the Trustee brings eight causes of action: 1) a demand for an accounting ("Count One"); 2) an equitable accounting claim ("Count Two"); 3) a claim for breach of contract in connection with the refusal to permit review of the Company's books and records ("Count Three"); 4) a claim seeking turnover of unpaid distributions or other amounts owing to the members or liquidators of East End Ventures ("Count Four"); 5) a claim seeking turnover of the Buyout Payment (as defined herein) to the members of East End Ventures ("Count Five"); 6) a claim for breach of contract in connection with the failure

to pay the Buyout Payment and improper distributions made from the Company to Bialsky ("Count Six"); 7) a claim for breach of fiduciary duty ("Count Seven"); and 8) a claim seeking entry of a declaratory judgment ("Count Eight"). [*See generally* Dkt. No. 1.] Defendants filed their answer to the Complaint on May 23, 2023. [Dkt. No. 14.]

IV.    **TRUSTEE'S MOTION SEEKING ORDER OF ATTACHMENT**

On November 7, 2023, the Trustee filed a motion seeking entry of an order of attachment, along with accompanying Huebscher Declaration, in the above-captioned adversary proceeding. [*See* Dkt. No. 75 at 6; *see also* Dkt. Nos. 48, 49.] In the motion, the Trustee alleged, *inter alia*, that Bialsky divested the Company of funds for his "personal benefit" in making certain challenged distributions to himself and that Bialsky has "failed to provide a sufficient accounting" of these transactions. [Dkt. No. 75 at 6.] The Trustee sought to prevent Bialsky from rendering himself, as well as the entities he controls, judgment-proof before the Court rules on Defendants' liability in this action. [*Id.*] As such, the Trustee sought entry of an order of attachment under New York law. [*Id.*] The Trustee filed corrected exhibits to the Huebscher Declaration on November 9, 2023. [*Id.*; *see also* Dkt. No. 50.]

On November 21, 2023, Defendants filed their opposition, along with accompanying declarations and exhibits. [Dkt. No. 75 at 6; *see also* Dkt. No. 51.] The Trustee filed a reply, as well as the Wickouski Declaration, on November 27, 2023. [Dkt. No. 75 at 6; *see also* Dkt. Nos. 52, 53.] Intervening Plaintiff filed a joinder to the motion on November 29, 2023. [Dkt. No. 75 at 6; *see also* Dkt. No. 54.]

The Court held a hearing on November 30, 2023, at which the Court inquired whether the parties intended to request an evidentiary hearing in connection with the motion. [Dkt. No. 75 at 6; Nov. 30 Hr'g Tr. at 48:22-51:24.] The parties submitted letters in response to the Court's inquiry. [Dkt. No. 75 at 6-7; *see also* Dkt. Nos. 55, 56.] The Court entered an order

scheduling an evidentiary hearing, which was held on December 11, 2023. [Dkt. No. 75 at 7; *see also* Dkt. No. 58.] On February 1, 2024, the Court issued a decision denying the motion. [*See generally* Dkt. No. 75.]

## V.    SUMMARY JUDGMENT BRIEFING

On February 22, 2024, the Court entered an order scheduling the parties' summary judgment briefing schedule. [Dkt. No. 78.] On March 18, 2024, Plaintiffs filed their motion for summary judgment ("PMSJ") [Dkt. No. 80], along with accompanying Statement of Facts ("P. SOF") [Dkt. No. 81], Feener Declaration [Dkt. No. 82][9], and Huebscher Declaration [Dkt. No. 83].[10] Plaintiffs move for summary judgment on Counts One, Two, Four, Five, Six, and Eight.

On April 18, 2024, Defendants filed their motion for summary judgment and opposition to Plaintiffs' MSJ ("DMSJ"), along with their Statement of Facts ("D. SOF"), Response to Plaintiffs Statement of Facts ("D. Resp. to P. SOF"), and other accompanying materials [Dkt. No. 92].[11] Defendants move for summary judgment on all counts in the

---

[9] On March 19, 2024, Plaintiffs filed a motion to redact the Feener Declaration. [Dkt. No. 85.] The Court entered an order granting the motion on March 22, 2024. [Dkt. No. 87.] Plaintiff filed corrected exhibits to the Feener Declaration on April 4, 2024 [Dkt. No. 90], as well as a redacted Feener Declaration on April 8, 2024 [Dkt. No. 91].

[10] On March 18, 2024, Plaintiffs filed a Motion for Preclusion and to Exclude Evidence, seeking an order (i) precluding Defendants from introducing or relying on their alternative "Exhibit B" at summary judgment and trial and (ii) prohibiting Defendants from introducing any evidence to support any cost allocation of the Sag Harbor development or any calculation of what is owed to Bialsky or Plaintiffs. [Dkt. No. 84.] On March 21, 2024, Defendants filed a letter requesting that the return date and briefing schedule in connection with Plaintiffs' motion correlate with the schedule for the parties' summary judgment motions. [Dkt. No. 86.] On April 1, 2024, the Court entered a scheduling order in connection with the preclusion motion. [Dkt. No. 88.] On April 18, 2024, Defendants filed a cross-motion to preclude the Trustee's summary of cost analysis evidence, as well as their opposition to Plaintiff's preclusion motion. [Dkt. No. 93]. On May 9, 2024, Plaintiffs filed their reply in support of their preclusion motion, as well as their opposition to Defendants' cross-motion. [Dkt. No. 98.] On August 20, 2024, the Court so-ordered a stipulation resolving the parties' cross-motions for preclusion. [Dkt. No. 102.]

[11] The parties adequately cite to the record in their respective statements of fact. *See generally* P. SOF; D. SOF. Defendants have done the same in responding to Plaintiffs' Statement of Facts. *See generally* D. Resp. to P. SOF. Plaintiffs, however, repeatedly object to certain material facts stated by the

Complaint. On May 9, 2024, Plaintiffs filed their opposition to Defendants' motion and reply in support of their motion ("P. Opp.") [Dkt. No. 97], as well as their response to Defendants' Statement of Facts ("P. Resp. to D. SOF") [Dkt. No. 99]. On May 24, 2024, Defendants filed their reply in support of their motion for summary judgment ("D. Reply") [Dkt. No. 100.] The Court held a hearing on the cross-motions for summary judgment on August 22, 2024 (the "August 22 Hearing").

As discussed *infra* Discussion Section I.C., the heart of this dispute is the parties' differing interpretations of key provisions of the Sag Harbor Operating Agreement. For the reasons set forth below, the Court concludes as follows: (i) as to Count Six, Defendants' motion is granted and Plaintiffs' motion is denied; (ii) as to Count Eight, Defendants' motion is granted and Plaintiffs' motion is denied; (iii) as to Counts Four and Five, Defendants' motion is granted and Plaintiffs' motion is denied; (iv) as to Counts One and Two, Defendants'

---

Defendants without citing to the record whatsoever. *See, e.g.*, P. Resp. to D. SOF at 25. Additionally, Plaintiffs did not respond to Defendants' statement of additional material facts not in dispute. As this Court has stated, "[a] mere denial by [a party] without citation to admissible evidence in the record is insufficient" on a motion for summary judgment. *Ethelberth v. Omogun (In re Omogun)*, No. 16-75566-las, Adv. No. 17-08023-las, 2022 WL 2517160, at *1 (Bankr. E.D.N.Y. July 6, 2022) (citation omitted). Rule 7056-1(c) of the Local Bankruptcy Rules for the U.S. Bankruptcy Court for the Eastern District of New York provides as follows: "All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted by the opposing party unless controverted by the statement required to be served by the opposing party. Each statement of material fact by a movant or opponent must be followed by citation to evidence which would be admissible, set forth as required by Federal Rule of Civil Procedure 56(c)." "Where the party opposing a motion for summary judgment fails to submit a proper counterstatement of material facts, controverting the moving party's statement, courts have deemed the moving party's statement of facts to be admitted and have granted summary judgment in favor of the moving party on the basis of the uncontroverted facts." *Aptive Env't, LLC v. Vill. of East Rockaway, N.Y.*, 19-CV-3365, 2020 WL 9211148, at *4 (E.D.N.Y. Dec. 23, 2020) (citation omitted). However, the Court has "broad discretion to determine whether to overlook a party's failure to comply with local court rules." *Omogun*, 2022 WL 2517160, at *8 (quoting *Hotlz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001)). Where material facts in a party's statement go uncontested, either in part or in full, they are not automatically accepted—they may be disregarded and the record independently reviewed if not properly supported with appropriate citations. *See Giannullo v. City of N.Y.*, 322 F.3d 139, 140 (2d Cir. 2003). Here, the Court has opted to independently review the record in reaching its decision.

motion is granted and Plaintiffs' motion is denied; and (v) as to Counts Three and Seven, Defendants' motion is granted.

## LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, made applicable to this adversary proceeding by Bankruptcy Rule 7056, summary judgment may not be granted unless the movant shows, based on admissible evidence in the record placed before the court, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) ("[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'") (quoting former Fed. R. Civ. P. 56(c)). A fact is considered material if it "might affect the outcome of the suit under the governing law," and a genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party bears the burden of demonstrating the absence of a genuine dispute as to any material fact. *Celotex*, 477 U.S. at 322-23. The evidence on each material element of its claim or defense must be sufficient to entitle the moving party to relief in its favor as a matter of law. *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004).

If the movant meets its initial burden, the nonmoving party "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting former Fed. R. Civ. P. 56) (emphasis omitted). "[M]ere speculation or conjecture as to the true nature of facts" will not suffice. *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010). Thus, to meet its burden, the

9

nonmoving party must offer more than a "scintilla of evidence" that a genuine dispute of material fact exists, *Anderson*, 477 U.S. at 252, or that there is some "metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. It must present "significant probative evidence" that a genuine issue of fact exists. *Anderson*, 477 U.S. at 249 (internal citations and quotations marks omitted). In addition, "[o]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment." *Porter v. Quarantillo*, 722 F. 3d 94, 97 (2d Cir. 2013) (internal quotation marks and citation omitted).

On a motion for summary judgment, the court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." *Dickerson v. Napolitano*, 604 F.3d 732, 740 (2d Cir. 2010). The Court's job is "not to weigh the evidence or resolve issues of fact." *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 254 (2d Cir. 2002). "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Jeffreys v. N.Y.C.*, 426 F.3d 549, 553 (2d Cir. 2005) (citation omitted). A court should grant the motion if "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there [being] no genuine issue for trial." *Matsushita*, 475 U.S. at 587 (internal quotation marks omitted).

"When deciding cross-motions for summary judgment, the standard to be applied 'is the same as that for individual summary judgment motions and a court must consider each motion independent of the other.'" *Hallingby v. Hallingby*, 693 F. Supp. 2d 360, 364 (S.D.N.Y. 2010) (quoting *Schultz v. Stoner,* 308 F.Supp.2d 289, 298 (S.D.N.Y. 2004)), *aff'd*, 453 F. App'x 121 (2d Cir. 2012) (summary order). "[E]ach party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose

10

motion is under consideration." *Morales v. Quintel Ent., Inc.*, 249 F.3d 115, 121 (2d Cir. 2001) (citation omitted).

**JURISDICTION**

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b) and the Standing Order of Reference of the United States District Court for the Eastern District of New York, dated August 28, 1986 (Weinstein, C.J.), as amended by Order dated December 5, 2012 (Amon, C.J.) entered in accordance with 28 U.S.C. § 157(a).

**DISCUSSION**

## I.    COUNT SIX

In Count Six, Plaintiffs seek damages for breach of the Sag Harbor Operating Agreement. Compl. ¶¶ 104-14. Count Six is brought against the Company, Bialsky, and JAB SH. *See id.* Plaintiffs and Defendants now cross-move for summary judgment in their favor on Count Six.

### A.  Legal Standard

To state a claim for breach of contract under New York law, a plaintiff must show "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of the contract by the defendant, and (4) damages." *New York City Transit Auth. v. Express Scripts, Inc.*, 588 F. Supp. 3d 424, 434 (S.D.N.Y. 2022) (quoting *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996)), *reconsideration denied*, No. 19-CV-5196 (JMF), 2022 WL 3577426 (S.D.N.Y. Aug. 19, 2022), *objections overruled*, No. 19-CV-5196 (JMF), 2022 WL 20056027 (S.D.N.Y. Oct. 12, 2022). The plaintiff must also "identify what provisions of the contract were breached as a result of the acts at issue." *Id.* (quoting *Chefs Diet Acquisition*

*Corp. v. Lean Chefs, LLC*, No. 14-CV-8467 (JMF), 2016 WL 5416498, at *8 (S.D.N.Y. Sept. 28, 2016)).

Generally, a court may grant summary judgment "only when the contractual language on which the moving party's case rests is found to be wholly unambiguous and to convey a definite meaning." *Id.* (quoting *Topps Co. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir. 2008)); *see also Postlewaite v. McGraw-Hill, Inc.*, 411 F.3d 63, 67 (2d Cir. 2005) (citation omitted) (explaining that "when the meaning of the contract is ambiguous and the intent of the parties becomes a matter of inquiry, a question of fact is presented which cannot be resolved on a motion for summary judgment"). "A contract is ambiguous if its language is 'capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement.'" *Express Scripts, Inc.*, 588 F. Supp. 3d at 434 (quoting *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1095 (2d Cir. 1993)); *see also Topps Co.*, 526 F.3d at 68 (citation omitted) ("Ambiguity here is defined in terms of whether a reasonably intelligent person viewing the contract objectively could interpret the language in more than one way."). "Conversely, 'a contract is unambiguous if the language it uses has a definite and precise meaning, as to which there is no reasonable basis for a difference of opinion.'" *Express Scripts, Inc.*, 588 F. Supp. 3d at 434 (quoting *Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011)). "Whether contract language is ambiguous is a question of law that is resolved by reference to the contract alone." *Id.* (quoting *O'Neil v. Ret. Plan for Salaried Emps. of RKO Gen., Inc.*, 37 F.3d 55, 58-59 (2d Cir. 1994)).

Several courts in this Circuit have acknowledged that, "[a]lthough a determination that a contract is ambiguous ordinarily requires denial of summary judgment, the court may nonetheless grant summary judgment where the extrinsic evidence illuminating the parties'

12

intended meaning of the contract is so one-sided that no reasonable person could decide to the contrary." *E.g.*, *Mindspirit, LLC v. Evalueserve Ltd.*, 346 F. Supp. 3d 552, 574–75 (S.D.N.Y. 2018) (quoting *New York Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc.*, 599 F.3d 102, 115 (2d Cir. 2010)). "Similarly, summary judgment may be granted despite any ambiguities in the contract where there is no extrinsic evidence that would support a resolution of the ambiguities in favor of the nonmoving party's case." *Id.* (citation omitted); *see also Topps Co.*, 526 F.3d at 68 (citation omitted) ("To the extent the moving party's case hinges on ambiguous contract language, summary judgment may be granted only if the ambiguities may be resolved through extrinsic evidence that is itself capable of only one interpretation, or where there is no extrinsic evidence that would support a resolution of these ambiguities in favor of the nonmoving party's case.").

### B. Provisions of the Sag Harbor Operating Agreement

#### 1. *Management of the Company*

Article IV of the Sag Harbor Operating Agreement concerns the management of the Company. Section 4.1 provides that "[m]anagement of the Company shall be vested in its Member, Jay Bialsky" and defines Bialsky as the Manager. SHOA § 4.1.

Section 4.2 provides as follows:

The business, affairs and assets of the Company shall be managed, arranged and caused to be coordinated by the Manager, who shall have, except as otherwise provided in this Agreement, full, exclusive and complete discretion with respect thereto. Subject to and in accordance with the provisions of this Agreement, the Manager shall have all necessary and appropriate powers to carry out the purposes of the Company set forth in Section 2.6. Except as otherwise provided in this Agreement, the Manager shall have the unilateral power and authority acting in good faith to make and implement all decisions with respect to all matters which the Company has the authority to perform[.]

SHOA § 4.2. Section 4.2 further enumerates certain powers of the Manager, including, among others, "the power to . . . deposit, withdraw, invest, pay, retain and distribute the Company's funds in a manner consistent with the provisions of this Agreement[.]" SHOA § 4.2(ix).

### 2. *Distributions*

Article VII of the Sag Harbor Operating Agreement concerns "Allocations and Distributions." Section 1.1(f) defines "Distribution" as "any cash and other property paid to a Member by the Company from the operations of the Company." SHOA § 1.1(f).

Section 7.3, titled "Distributions," provides that "[t]he Manager may from time to time, in the discretion of the Manager, make Distributions to the Members." SHOA § 7.3. Section 7.3 further requires that "[a]ll Distributions shall be made to the Members in the following order or priority":

**First**: to pay Manager Thirty-Five percent (35%) of the net proceeds of the sale of the Ferry Road lot to the Town of Southampton, but only after payment of 65% of such net proceeds to Mid First Bank;

**Second**: to pay all interest, principal and other sums payable with respect to the balance of loans for acquisition and construction financing made to the subsidiaries of the Company;

**Third**: Twelve percent (12%) preferred distribution on all Capital Contributions[12] and guaranteed loans by JAB SH HOLDINGS LLC or Jay Bialsky which shall include the initial loan of Seven Hundred Fifty Thousand Dollars ($750,000) of which Two Hundred Fifty Thousand Dollars ($250,000) has been advanced by the date hereof;

**Fourth**: to pay the Capital Contribution by JAB SH HOLDINGS LLC to the Company; and

**Fifth**: to each Member in proportion to such Member's Membership Interest.

SHOA § 7.3.

---

[12] Section 1.1(c) defines "Capital Contribution" as "any contribution by a Member to the capital of the Company in cash, property, or services rendered." SHOA § 1.1(c).

Section 7.4, titled "Offset," provides that "[t]he Company may offset all amounts owing to the Company by a Member against any Distribution to be made by such Member." SHOA § 7.4.

Section 7.5, titled "Limitations Upon Distributions," provides as follows: "No Distribution shall be declared and paid unless, after such Distribution is made, the assets of the Company are in excess of all liabilities of the Company." SHOA § 7.5.

### 3. "Member Buyout Options" in Section 7.8 and Exhibit B

Section 7.8 of the Sag Harbor Operating Agreement, titled "Buyout," provides as follows: "At any time after the date hereof, Manager shall have the buyout options as set forth on **Exhibit B** attached hereto and made a part hereof." SHOA § 7.8.

Exhibit B, titled "2 West Water Street, Sag Harbor – Member Buyout Options," sets forth the following:

| Option A: |
| --- |
| Unit 1 - Jay Bialsky personal unit |
| Unit 2 - For sale at asking price of $14,900.000.00 |
| Unit 3 - For sale at asking price of $14,900.000.00 |
| See Exhibit C foundation plan attached hereto for Option A unit layout. |
| After $10,000,000.00 sale of Ferry Road to the Town (this figure is an estimate and profits will increase if a higher sale price is received) and Jay's Purchase of his unit at $5,400,000.00 based on a $9,000,000.00 land book value, the dirt value of Unit 2 and Unit 3, approximately $1,800,000.00 each (excluding soft costs) |
| Estimated cost of constructions $8,000,000.00 ($4,000,000.00 per unit) |
| Project sale price of $28,000,000.00 ($14,000,000.00 per unit) |
| Potential net profit on sale of Units 2 and 3 as constructed of $16,000,000.00 |
| 55% of potential profit of constructed units to JAB = $8,800,000.00 |
| 45% of potential profit of constructed units to East End Members = $7,200,000.00 |

| Option B: |
| --- |
| Market 2 West Water Street with 13 approved units and docks for $25,000,000.00 |
| Net profits shall be split as follows: |
| 60% of net profit to JAB |
| 40% of net profit to East End Members<br>No guaranteed minimum payment under this option. |

### C.  Summary of the Parties' Arguments

Plaintiffs argue that Defendants breached the Sag Harbor Operating Agreement by i) failing to pay the Buyout Payment (as defined below) to East End Ventures, and ii) making allegedly improper distributions to Bialsky from the Company.

#### 1.  *Buyout Payment*

The parties' conflicting interpretations of provisions relevant to the Buyout Payment stems, in part, from differing views of what the "buyout" under the agreement is, more broadly. Plaintiffs read the buyout provisions as setting forth the amount due to East End Ventures in exchange for their membership interests in the Company. *See* PMSJ at 12, 14; P. Opp. at 3. Defendants, however, read the "buyout" provisions as referring to a potential buyout of 2 West Water Street—*not* the buyout of East End Ventures' membership interests. *See* DMSJ at 2, 22, 25-28; D. Reply at 2-3.

For their part, Plaintiffs maintain that Bialsky elected Option A under Exhibit B to the operating agreement on July 24, 2019, and East End Ventures is thus entitled to the "Buyout Payment"—a term coined by Plaintiffs that is not expressly defined in the agreement. *See* PMSJ at 11-12 (arguing that Option A was "irrevocably elected . . . in connection with the closing of the sale of Ferry Road to the town of Southampton and the approval by the town of the plan to construct the Sag Harbor Project as three units"); *see also id.* at 4 (defining "Buyout Payment"). Under Plaintiffs' reading of the agreement, Exhibit B sets forth a formula, which provides that East End Ventures is entitled to "(i) the land value of Unit A (which, in the operative Exhibit B to the Sag Harbor Operating Agreement, is $5,400,000), *plus* (ii) 45% of the 'profit of constructed units'—i.e., Units B and C." *See id.* at 12-13; P. Opp. at 4 ("The Buyout Payment is calculated according to the formula in Exhibit B: in essence, the land value of Unit A plus 45% of the net profits on Units B and C after land value and construction costs."). Plaintiffs further maintain that, "[b]ecause the Unit C sale

16

closed over two years ago, the portion of the Buyout Payment attributable to the profits on Unit C, in addition to the land value of Unit A, are presently due and owing." PMSJ at 13.

Defendants respond that Bialsky did not elect Option A until April 14, 2023, when he purchased and took possession of Unit A. *See* DMSJ at 16, 32-33. Defendants read Section 7.8 and Exhibit B to provide as follows:

> To purchase Unit [A], Bialsky would pay Sag Harbor $5.4 million[13], which is equal to 60% of the agreed $9 million land book value of the entire property, with the land for the other two units, referred to as Units [B] and [C], each comprising 20% of the property and valued at $1.8 million each (excluding soft costs). . . . Units [B] and [C] would be constructed and placed on the market. The Members would divide the net profits from the sale of Units [B] and [C] with JAB SH receiving 55% and East End Ventures receiving 45%.

*Id.* at 25. Under Defendants' reading, neither Option A nor Option B "contemplates or otherwise requires Bialsky or JAB SH to *buy out the membership interests of East End Ventures* or otherwise pay East End Ventures *anything*." *Id.* (emphasis in original). Rather, the only payment that Bialsky is required to make is to the Company, not East End Ventures, in the event he decided to purchase Unit [A], as "Option A says nothing about Bialsky (or JAB SH) tendering payment of the purchase price to East End Ventures." *Id.*; *see also* Aug. 22 Hr'g Tr. at 22:10-24 (wherein counsel for Defendants argues that the purchase price "cannot possibly be construed as a payment to East End Ventures because Unit-A is not owned by East End Ventures" and the split of profits does not contemplate "payment from one member to another"). Defendants argue that East End Ventures is only to receive the

---

[13] Defendants maintain that the purchase price for the land for Unit A was properly adjusted from $5.4 million to $3.69 million due to changes in the building foundation plan ultimately approved by the town. *See* DMSJ at 33-36. This is reflected in what Defendants refer to as "New Exhibit B," which was never signed by anyone associated with the Maidan or Talel estates. *See id.*; *see also* PMSJ at 6-7, 17. In their summary judgment briefing, Plaintiffs contended that Defendants' reliance on "New Exhibit B"—an inoperative amendment to Exhibit B of the Sag Harbor Operating Agreement—was improper. *See id.*; *see also* P. Opp. at 7. Defendants respond that "New Exhibit B" was offered not because they contend it amended and replaced the current Exhibit B, but as parol evidence of the parties' understanding concerning the intent of the original Exhibit B. *See* DMSJ at 35. "New Exhibit B" was not considered by the Court in reaching its decision.

amount payable from the Company's net profits from the sale of Units B and C. *See* DMSJ at 25-26. Defendants also argue that Plaintiffs fail to identify any clause requiring Bialsky to distribute interim net profits after the sale of Unit B, *id.* at 30, and that the breach of contract claim is premature because any recoverable damages would be contingent on the sale of Unit B and the final resolution of the issues concerning Unit C—neither of which have occurred. *Id.* at 40-42.

The parties also disagree about the relationship between the provisions in Section 7.8 and Exhibit B, and the waterfall provisions set forth in Section 7.3. In sum, Plaintiffs maintain that Sections 7.3 and 7.8 are mutually exclusive: Section 7.3 governs distributions to members of the Company, and the Buyout Payment is not a "distribution" subject to the waterfall. *See* PMSJ at 13-16; P. Opp. at 2-3; *see also* Aug. 22 Hr'g Tr. at 10:11-11:3 (arguing that "the buyout is a fundamentally different transaction than a distribution by the manager on behalf of the LLC from profits of the LLC"). Defendants, however, do not interpret the waterfall in Section 7.3 to be overridden by Section 7.8. Defendants cite Section 7.1, which provides that "Net Profit"—a defined term in the agreement that appears in Exhibit B[14]—is allocated "after the application of Section 7.3." *See* DMSJ at 31. Defendants also read Section 3.7—"Priority and Return of Capital"—to clarify that the order of priority of Distributions in the waterfall takes priority over any Member's right to claim priority over any other Member with respect to Net Profits. *Id.*

---

[14] Plaintiffs dispute this contention. *See* Aug. 22 Hr'g Tr. at 11:4-14 (wherein counsel for Trustee argues that the buyout provisions in Exhibit B do not use the term "Net Profits" as defined in Section 1.1(m) of the Sag Harbor Operating Agreement, as the term is not capitalized in the exhibit); *see also* P. Opp. at 5 n.11.

### 2. *Distributions*

Plaintiffs allege that Bialsky took $10,410,784.96 in purportedly improper distributions over the period February 2019 through April 23, 2023. *See* PMSJ at 18. Plaintiffs maintain that these distributions were improper for several reasons. First, Plaintiffs note that, under Section 7.5 of the Sag Harbor Operating Agreement, "no Distribution shall be made unless, after such Distribution is made, the assets of the Company are in excess of all liabilities of the Company," and maintain that Defendants produced no evidence of any solvency analysis undertaken before each of these distributions was made. *Id.* Second, Plaintiffs argue that "the Manager has been improperly accruing for himself a 12% 'preferred distribution' on liabilities of [the Company] to which he has no right." *Id.* at 18-19.

Defendants counter that the distributions were proper. They maintain that no formal solvency analysis is required under the Sag Harbor Operating Agreement and cite the balance sheet on the Company's tax returns indicating that the book value of the Company's assets exceeded its liabilities in each year from 2019 to 2022. *See* DMSJ at 36-37. Additionally, Defendants cite the third paragraph of the waterfall, arguing that the 12% preferred distribution is due for all monies that Bialsky or JAB SH personally invested, or that are derived from loans that either one guaranteed. *Id.* at 37.

### D. Discussion

In evaluating the parties' cross-motions for summary judgment, the Court has applied the same standard as that which is applicable to individual summary judgment motions and considered each motion independent of the other. *See Hallingby*, 693 F. Supp. 2d at 364. The Court has examined Plaintiffs' and Defendants' motions on their own merits, *see Morales*,

19

249 F.3d at 121, and has determined that Defendants have carried their burden, while Plaintiffs failed to carry their burden, in connection with the breach of contract claim.

Therefore, the Court denies Plaintiffs' motion, and grants Defendants' motion, as to Count Six. *See generally Bassi v. New York Med. Coll.*, No. 19 Civ. 7542 (NSR), 2023 WL 2330478, at \*14 (S.D.N.Y. Mar. 2, 2023) (granting defendants' motions for summary judgment, and denying plaintiff's cross-motion for summary judgment, on breach of contract claim where plaintiff failed to raise a genuine dispute of material fact as to plaintiff's alleged breaches), *aff'd*, No. 23-278, 2024 WL 3717317 (2d Cir. Aug. 8, 2024) (summary order); *McKenzie v. Fishko*, No. 12CV7297-LTS-KNF, 2015 WL 685927, at \*7 (S.D.N.Y. Feb. 13, 2015) (concluding that plaintiffs "failed to proffer evidence sufficient to sustain the burden of proof on their breach of contract claim," granting defendants' motion for summary judgment dismissing that cause of action, and denying plaintiffs' cross-motion for summary judgment).

### 1.  Meaning of "Buyout"

There is no support for Plaintiffs' contention that the "Member Buyout Options" set forth in Exhibit B contemplate a "buyout" of East End Ventures' *membership interests* in the Company.

The Court begins with an analysis of the plain language of the agreement. *See Ellington v. EMI Music, Inc.*, 21 N.E.3d 1000, 1003 (N.Y. 2014) (quoting *Greenfield v. Philles Recs, Inc.*, 780 N.E.2d 166, 170 (N.Y. 2002)) ("The best evidence of what parties to a written agreement intend is what they say in their writing . . . a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms."). Plaintiffs appear to rely, in part, on the headings for Section 7.8, "Buyout," and Exhibit B, which includes the language, "Member Buyout Options." SHOA § 7.8. As a preliminary matter, Section 11.4 provides that "[t]he headings in this Agreement are for convenience only and shall not be used to interpret or construe any provision of this

Agreement." *Id.* § 11.4. Significantly, while "buyout" is not defined in the agreement[15], "Membership Interests"—a term defined in Section 1.1(i)—does not appear *anywhere* in Exhibit B. *See id.* § 1.1(i). The only provisions that expressly provide for the transfer of "Membership Interests" appear in Article IX, and no provision of Article IX references the "buyout" mechanism in Section 7.8 and Exhibit B. *See generally* SHOA art. IX.

Plaintiffs' argument that the deduction from East End Ventures' capital account reflected their right to Defendants' buyout of East End Ventures' membership interest is unfounded. *See* PMSJ at 11-12. Defendants correctly note that capital accounts can fluctuate—and can even reflect a zero or negative balance—but such a reduction would not automatically terminate East End Ventures' membership. *See* DMSJ at 26-27; SHOA § 6.3 (describing when members' capital accounts will increase and decrease); SHOA § 6.4 (contemplating a negative balance in a member's capital account). Nor have Plaintiffs substantiated their contention that the definition of "Membership Interests" in Article I points to a buyout because of East End Ventures' purported lack of capital contributions.[16] *See* PMSJ at 12. The agreement defines "Capital Contribution" as "any contribution by a Member to the capital of the Company in cash, property or services rendered." SHOA § 1.1(c). Plaintiffs seem to ask the Court to read this portion to mean that a deduction from East End Ventures' capital *account* somehow coincides with a deduction of its capital *contribution*. *See* PMSJ at 12. The agreement itself belies Plaintiffs' characterization—in addition to the

---

[15] Plaintiffs cite to Merriam-Webster's definition of "buyout" for support. PMSJ at 12 n.17. Plaintiffs' requested "Buyout Payment" does not exist in the agreement itself, making their attempt to define the term unwarranted here. *See generally* SHOA art. IX. Moreover, as the Court discusses *infra*, the drop in East End Ventures' capital account balance after Bialsky exercised Option A is of no consequence to the members' interests in the Company. *See* SHOA §§ 1.1, 6.1, 6.3 (differentiating between capital accounts and capital contributions).

[16] In their motion, Plaintiffs claim "[n]o Capital Contributions from East End Ventures means no Membership Interests, because the Manager bought them out." PMSJ at 12.

definition of capital contribution in Section 1.1, Sections 6.1 and 6.3 clearly spell out the difference between a capital account and contribution. *See* SHOA §§ 1.1, 6.1, 6.3.

### 2. *Buyout Payment*

It is well-established that "[c]ourts may 'not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing.'" *Abundance Partners LP v. Quamtel, Inc.*, 840 F. Supp. 2d 758, 767 (S.D.N.Y. 2012) (quoting *Vt. Teddy Bear Co. v. 538 Madison Realty Co.*, 1 N.Y.3d 470, 475 (N.Y.2004)) (granting defendant's motion for summary judgment dismissing breach of contract claims); *see also Kaplin v. Buendia*, No. 15 Civ. 649 (PAC), 2021 WL 1405517, at *7 (S.D.N.Y. Apr. 14, 2021) (observing that "Plaintiff's proposed construction invites the Court to add or at least redefine terms, which would effectively (and impermissibly) rewrite the contract" and declining to do so here); *Mercury Partners LLC v. Pac. Med. Bldgs., L.P.*, No. 02 Civ. 6005 (HBP), 2007 WL 2197830, at *14 (S.D.N.Y. July 31, 2007) (quoting *John Doris, Inc. v. Solomon R. Guggenheim Found.*, 209 A.D.2d 380, 381 (2d Dep't 1994)) ("Under New York law, 'the courts may not rewrite the agreement to relieve a sophisticated contracting party from terms that it later deems disadvantageous.'").

As discussed *supra*, the term "Buyout Payment" does not appear in the Sag Harbor Operating Agreement. In defining the term, Plaintiffs cobble together a formula by combining provisions that appear in Exhibit B. This is an impermissible departure from the plain language in Exhibit B. *See Bank v. Verde Energy USA, Inc.*, 19-cv-01472, 2020 WL 5596046, at *6 (E.D.N.Y. Sept. 18, 2020) (quoting *W.W.W. Assocs. v. Giancontieri*, 77 N.Y.2d 157, 163 (N.Y. 1990)) ("By ignoring the plain language of the contract, [the] plaintiff effectively rewrites the bargain that was struck.").

As a preliminary matter, there is no textual support for Plaintiffs' contention that East End Ventures is entitled to the $5.4 million purchase price for Unit A. The Court need

only consider the plain language of the agreement to reach this conclusion. *See Ellington*, 21 N.E.3d at 1003. The "East End Members" are not referenced *anywhere* in the relevant portion of Option A in Exhibit B discussing "Jay's Purchase of his unit at $5,400,000.00 based on a $9,000,000.00 land book value[.]" *See* SHOA Ex. B. This makes logical sense: Defendants highlight—and Plaintiffs do not dispute—that Unit A was owned by, and purchased from, the *Company*, not East End Ventures. *See* DMSJ at 25. Indeed, the only reference to "East End Members" under Option A in Exhibit B appears in connection with their entitlement to "45% of potential profit of constructed units[.]" *See* SHOA Ex. B. Thus, Plaintiffs "seek[] to rewrite the contract to say something other than what it says. Far from compelling that outcome, New York law expressly prohibits it." *Golden Unicorn Enters., Inc. v. Audible, Inc.*, 682 F. Supp. 3d 368, 376 (S.D.N.Y. 2023).

It is widely acknowledged that "[c]ourts should be 'extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include.'" *Ambac Assurance Corp. v. U.S. Bank Nat'l Ass'n*, No. 18 Civ. 5182 (LGS), 2020 WL 7211217, at *8 (S.D.N.Y. Dec. 7, 2020) (quoting *Global Reinsurance Corp. of Am. v. Century Indem*. Co., 91 N.E.3d 1186, 1193 (N.Y. 2017)), *aff'd*, No. 21-70-cv, 2021 WL 6060710 (2d Cir. Dec. 20, 2021) (summary order); *see also One Stop 34, LLC v. Stimdel Properties (FL), Inc.*, No. 19-CV-04011, 2021 WL 8344133, at *7-8 (E.D.N.Y. Sept. 4, 2021) (citations omitted) ("In the context of a commercial contract, New York courts are particularly reluctant to find ambiguity from absent terms . . . . Because the Lease does not contain *any* term regarding access to the parking and loading area of the Demised Premises, there is no basis for finding that the parties intended to create such form of access, especially access entailing property not covered by the Lease."), *report and recommendation adopted*, No. 19-CV-04011, 2022 WL 985834 (E.D.N.Y. Mar. 31, 2022). Therefore, given the absence of *any* language in the

agreement[17] in support of Plaintiffs' contention that East End Ventures is entitled to the $5.4 million, the Court concludes that the Sag Harbor Operating Agreement is unambiguous on this point, and Defendants have not breached the agreement by failing to turn this amount over to East End Ventures.[18]

Additionally, Defendants have not breached the Sag Harbor Operating Agreement by failing to pay "45% of potential profit of constructed units" to East End Ventures at this juncture. As relevant here, the parties agree that: 1) "potential profit of constructed units," as used in the two pertinent provisions of Option A in Exhibit B concerning the "55%/45%"

---

[17] In response to Plaintiffs' argument concerning the $5.4 million, Defendants cite Debtor's bankruptcy filings wherein (i) Debtor listed a $0 valuation of his 50% interest in East End Ventures on October 11, 2019; (ii) Debtor's son filed a disclosure statement representing that East End Ventures has a minority interest in the development project and will receive a distribution "if there are any profits after the sale of the developed properties"; and (iii) Debtor's son filed a proposed liquidating plan stating that "[t]he Debtor's estate is entitled to equity in the project after the project is completed and all debts are paid." *See id.* at 3-4 (citing [Bankr. Dkt. Nos. 15, 135, 136]). Because the agreement is unambiguous, however, on the question of whether East End Ventures is entitled to the $5.4 million, the Court need not consider any extrinsic evidence beyond the four corners of the agreement. *See Elecs. & Telecomms. Rsch. Inst. v. Acacia Rsch. Grp., LLC*, No. 15-CV-3419 (VSB), 2017 WL 2389699, at *5 (S.D.N.Y. June 1, 2017) (quoting *Chesapeake Energy Corp. v. Bank of N.Y. Mellon Trust Co.,* 773 F.3d 110, 114 (2d Cir. 2014)) ("If the court finds that the contract is unambiguous, 'the intent of the parties must be found within the four corners of the contract' and the court should interpret the contract without the aid of extrinsic evidence.").

[18] By concluding that the Sag Harbor Operating Agreement unambiguously does *not* entitle East End Ventures to the purchase price of $5.4 million, the Court is not making any findings as to what ultimately does happen to the funds under the agreement. This issue is not outcome-determinative for purposes of resolving the motions for summary judgment presently before the Court. *See Kaplin v. Buendia*, No. 15 Civ. 649 (PAC), 2021 WL 1405517, at *4 (S.D.N.Y. Apr. 14, 2021) ("[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact . . . . [T]he substantive law ... identif[ies] which facts are material, and [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment") (internal citations omitted).

split, refers to profits from the sale of Units B and C[19]; 2) Unit C has sold[20]; and 3) Unit B has not yet sold.[21]

First, Plaintiffs fail to cite any provision of the Sag Harbor Operating Agreement that obligates the distribution of amounts owed to the East End Members pursuant to Option A in Exhibit B *on an interim basis*. *See Elecs. & Telecomms. Rsch. Inst.*, 2017 WL 2389699, at \*7 (denying plaintiff's motion for partial summary judgment on breach of contract claim where, among other things, plaintiff failed to identify language in support of its interpretation in governing agreements); *see also* DMSJ at 30. Upon review of the agreement, the Court concludes that no such provision exists. Second, Defendants correctly highlight— and Plaintiffs concede—that Unit B has not sold, so the profits cannot even be ascertained. *See* Aug. 22 Hr'g Tr. at 21:13-19, 32:7-15; *Ashland Mgmt. Inc. v. Janien*, 624 N.E.2d 1007, 1010 (N.Y. 1993) ("A party may not recover damages for lost profits unless they were within the contemplation of the parties at the time the contract was entered into and are capable of measurement with reasonable certainty.").

---

[19] *See* PSMJ at 12-13 (citing East End Ventures' entitlement to 45% of the "profit of constructed units"—*i.e., Units B and C*) (emphasis added); P. Opp. at 4 (arguing that East End Ventures is entitled to the Buyout Payment, which includes "45% of the net profits on *Units B and C* after land value and construction costs") (emphasis added); *id*. at 8 (arguing that East End Ventures are entitled to net profits from the sale of Unit C, which has occurred, and from the sale of Unit B, which has not yet occurred); DMSJ at 30-31 (arguing that the operating agreement "establishes a 55%/45% allocation of potential net profits between the Members on the sale of *Units 2 and 3 (i.e. B and C)*") (emphasis added); *see also* Aug. 22 Hr'g Tr. at 8:24-9:2 (wherein counsel for Trustee represents that the "buyout amount" includes "45% of the profits on Unit-B and C").

[20] *See* P. SOF at 11-12; D. SOF at 21-24; *see also* PMSJ at 2, 7 (representing that Unit C has sold); P. Opp. at 8-9; DMSJ at 30 (representing that "Unit C sold in July 2021" while noting that "there are still open issues and disagreements that remain between Sag Harbor and the buyer of that unit").

[21] *See* D. SOF at 26-27; *see also* PMSJ at 16; P. Opp. at 12-13; DMSJ at 16-17; P. Resp. to D. SOF at 43; Aug. 22 Hr'g Tr. at 21:16 (wherein counsel for Defendants represents that Unit B is not sold).

Because Defendants are not in breach for failing to provide the Buyout Payment[22]— as defined by Plaintiffs—to East End Ventures, and because the action is otherwise premature, the Court grants summary judgment in favor of Defendants on Count Six.

### 3. *Distributions*

The Court also denies Plaintiffs' motion, and grants Defendants' motion, seeking summary judgment on Count Six concerning the allegedly improper distributions.

First, Plaintiffs argue that Defendants produced no evidence that a solvency analysis was undertaken before each of the distributions made to Bialsky and, "[a]bsent any such analysis, none of the Manager's distributions are valid under the Sag Harbor Operating Agreement." PMSJ at 18. The Court again returns to the plain language of the Sag Harbor Operating Agreement, which imposes no affirmative requirement that a "solvency analysis" be formally prepared or documented, as Plaintiffs seem to suggest. *See* DMSJ at 36-37; *see Kaplin*, 2021 WL 1405517, at *7 (ruling in favor of a contractual interpretation that "gives the words of the contract their plain meaning"). Section 7.5 merely provides as follows: "No Distribution shall be declared and paid unless, after such Distribution is made, the assets of the company are in excess of all liabilities of the Company." SHOA § 7.5. There are no other provisions pertinent to Distributions that impose the obligation referenced by Plaintiffs. Plaintiffs cannot now create an obligation that plainly does not exist in the unambiguous text of the Sag Harbor Operating Agreement. *See N. Am. Photon Infotech Ltd. v. ZoomInfo LLC*,

---

[22] *See, e.g.*, *Malmsteen v. Universal Music Grp., Inc.*, 940 F. Supp. 2d 123, 136 (S.D.N.Y. 2013) (rejecting plaintiff's reading of agreement, granting defendants' cross-motion for summary judgment—and denying plaintiff's cross-motion for summary judgment—on breach of contract claim); *MBIA Ins. Corp. v. Cooperatieve Centrale Raiffeisen-Boerenleenbank B.A.*, No. 09 Civ. 10093 (RJS), 2011 WL 1197634, at *13 (S.D.N.Y. Mar. 25, 2011) (denying plaintiffs' cross-motion for summary judgment—and granting defendants' cross-motions for summary judgment—on breach of contract claim for lack of consent based on unambiguous language in governing documents); *Sussman v. Rabobank Int'l*, 739 F. Supp. 2d 624, 629 (S.D.N.Y. 2010) (concluding that, in light of the plain language in the agreements at issue, plaintiff "failed to raise a genuine issue of any material fact" that supports a finding of breach of contract, granting defendant's motion for summary judgment, and denying plaintiff's cross-motion).

No. 20 CIV. 2180 (JPC), 2021 WL 4482208, at *5 (S.D.N.Y. Sept. 30, 2021) (citation omitted) (noting that "the Court will not create an obligation absent from the contract"), *aff'd as to liability,* No. 22-1979, 2024 WL 4799843 (2d Cir. Nov. 15, 2024) (summary order).

Critically, Plaintiffs offered no evidence on the record to suggest that the Company's assets did not, in fact, exceed liabilities after the Distributions were made, nor do they contest Defendants' contentions regarding the balance sheets on the Company's tax returns from 2019 through 2022. *See* DMSJ at 37. Plaintiffs do not dispute Defendants' representations that the book value of the Company's assets exceed its liabilities at the beginning and end of the years 2019, 2020, 2021, and 2022, and that the Company issued Schedule K-1s to East End Ventures for those tax years. *See* P. Resp. to D. SOF at 63-65.

Second, Plaintiffs improperly argue that construing Section 7.3 as to entitle Bialsky to a 12% preferred distribution on "every penny loaned to Sag Harbor . . . as long as he personally guarantees it" runs afoul of contract interpretation principles. *See* PMSJ at 19; SHOA § 7.3. Defendants correctly note that the plain language of the waterfall provision in Section 7.3 entitles Bialsky to just that. *See* DMSJ at 37; SHOA § 7.3. Plaintiffs take the position that it would be "commercially absurd" to suggest Mr. Maiden and Talel would agree to this preference. *See* Aug. 22 Hr'g Tr. at 19:22-20:6. The plain language of the agreement says otherwise, putting third in order of distributions—which are within the "discretion of the Manager" to make—"[t]welve percent (12%) preferred distribution on all Capital Contributions and guaranteed loans by JAB SH [] or Jay Bialsky . . . ." SHOA § 7.3. The Court will not "rewrite the contract" based on Plaintiffs' discontent with the reasonableness of their own terms. *Kaplin*, 2021 WL 1405517, at *7; *Verde Energy USA, Inc.*, 2020 WL 5596046, at *6; *Mercury Partners LLC*, 2007 WL 2197830, at *14 (quoting *New England Merch. Nat'l Bank v. Iran Power Gen. & Transmission Co.*, 502 F. Supp. 120, 127 (S.D.N.Y. 1980),

*abrogated on other grounds*, 646 F.2d 779 (2d Cir. 1981)) ("It is the parties' 'intention as it existed at the time the contract was executed which must control rather than any subsequent intention tailored to complement an individual's posture once an agreement has gone sour.'").

## II.    COUNT EIGHT

Count Eight seeks a declaratory judgment that East End Ventures is entitled to the Buyout Payment and distributions or other amounts owing under the Sag Harbor Operating Agreement. Compl. ¶¶ 121-28. Plaintiffs and Defendants now cross-move for summary judgment in their favor on Count Eight.

### A.  Legal Standard

The Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a); *see also Admiral Ins. Co. v. Niagara Transformer Corp.*, 57 F.4th 85, 92 (2d Cir. 2023) (citing 28 U.S.C. § 2201(a)). The Second Circuit has held that the following considerations, to the extent relevant in a particular case, should inform a court's exercise of discretion to decline jurisdiction under the Declaratory Judgment Act:

> (1) whether the [declaratory] judgment [sought] will serve a useful purpose in clarifying or settling the legal issues involved;
> (2) whether [such] a judgment would finalize the controversy and offer relief from uncertainty;
> (3) whether the proposed remedy is being used merely for procedural fencing or a race to res judicata;
> (4) whether the use of a declaratory judgment would increase friction between sovereign legal systems or improperly encroach on the domain of a state or foreign court;
> (5) whether there is a better or more effective remedy; and
> (6) whether concerns for judicial efficiency and judicial economy favor declining to exercise jurisdiction.

*See Admiral Ins. Co.*, 57 F.4th at 99-100 (internal quotation marks and citations omitted). Even in circumstances where a declaratory judgment would "serve a useful purpose in clarifying and settling the legal relations in issue or terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding," district courts retain broad discretion to decline jurisdiction under the Declaratory Judgment Act. *Id.* at 99 (internal quotation marks and citations omitted).

Inherent in district courts' broad discretion to decline jurisdiction is a similarly broad discretion to weigh the factors enumerated in *Admiral*. *Id.* at 100. "[N]o one factor is sufficient, by itself, to mandate that a district court exercise—or decline to exercise—its jurisdiction to issue a declaratory judgment." *Id.* "Likewise, '[t]hese factors are non-exhaustive,'" and courts retain "wide latitude to address other factors as relevant to the ultimate question of whether 'the normal principle that federal courts should adjudicate claims [over which they have] jurisdiction' should 'yield[] to considerations of practicality and wise judicial administration' in a particular case." *Id.* (internal citations omitted).

### B.  Summary of the Parties' Arguments

Defendants maintain that a declaratory judgment would not serve any useful purpose because Count Eight is duplicative of the breach of contract claim in Count Six and, therefore, the Court should decline to exercise jurisdiction over the declaratory judgment claim. DMSJ at 48-49 (collecting authority). Plaintiffs respond that this consideration alone is insufficient to support a decision to abstain from exercising jurisdiction, and that entry of a declaratory judgment would nevertheless "serve the useful purpose of establishing East End Ventures' entitlement to the Buyout Payment, with the amount of damages to be finally ascertained once Unit B sells." P. Opp. at 12-13.

### C. Discussion

In considering the relevant *Admiral* factors, the Court concludes that a declaratory judgment would not serve a useful purpose, or finalize the controversy or offer relief from uncertainty, and that concerns for judicial efficiency and judicial economy favor declining to exercise jurisdiction over the claim.

Courts have recognized that, "[w]hen a plaintiff's contract claim 'will necessarily settle the issues for which the declaratory judgment is sought,' a declaratory-judgment claim 'will serve no useful purpose and will not serve to offer relief from uncertainty.'" *Del Mar TIC I, LLC v. Bancorp Bank*, No. 1:23-cv-08999 (JLR), 2024 WL 2213472, at *9 (S.D.N.Y. May 16, 2024) (quoting *EFG Bank AG, Cayman Branch v. AXA Equitable Life Ins. Co.*, 309 F. Supp. 3d 89, 100 (S.D.N.Y. 2018)); *see also Lim v. Radish Media Inc.*, No. 22-1610, 2023 WL 2440160, at *2 (2d Cir. Mar. 10, 2023) (summary order) (citation omitted) (concluding that declaratory judgment claim was correctly dismissed because no useful purpose would be served in granting declaratory relief where the issues on which plaintiff sought declaratory relief were necessarily decided in the determination of the breach of contract claims); *Ambac Assurance Corp. v. U.S. Bank Nat'l Ass'n*, No. 21-70-CV, 2021 WL 6060710, at *5 (2d Cir. Dec. 20, 2021) (summary order) (same). Courts have thus regularly exercised their discretion to dismiss declaratory judgment claims when they are duplicative of other claims in the suit. *See Del Mar TIC I, LLC*, 2024 WL 2213472, at *9 (collecting cases); *Parts Auth., LLC v. Beyda*, No. 23-CV-07656 (NCM) (VMS), 2024 WL 3553447, at *4 (E.D.N.Y. July 26, 2024) ("In federal actions, courts have refrained from exercising jurisdiction over a declaratory action when the issue would necessarily be determined through separate claims. Courts may compare the declaratory claim to separate claims made within the same lawsuit or a claim raised in a separate lawsuit.") (comparing cases); *Frommer v. MoneyLion Techs. Inc.*, No. 23-CV-6339 (JMF), 2024 WL 2158589, at *11 (S.D.N.Y. May 14, 2024) ("The decision whether to grant

30

declaratory relief under the Declaratory Judgment Act . . . is subject to the Court's 'broad discretion,' to be informed by a variety of factors including 'considerations of practicality and wise judicial administration . . . .' In view of such considerations, courts 'generally reject a DJA claim when other claims in the suit will resolve the same issues.'") (internal citations omitted).

Plaintiffs' declaratory judgment claim does not "serve a useful purpose in clarifying or settling the legal issues" where "the breach of contract claim governs the substance of this dispute." *See Com. Tenant Servs., Inc. v. Penske Bus. Media, LLC*, No. 20-CV-9756 (SHS), 2022 WL 4292971, at \*6 (S.D.N.Y. Sept. 16, 2022). Therefore, the Court grants Defendants' request for summary judgment as to Count Eight. *See Apollo Capital Corp. v. Astra Veda Corp.*, No. 23-CV-9708 (AS), 2024 WL 3729093, at \*7 (S.D.N.Y. Aug. 7, 2024) (granting summary judgment as to declaratory judgment claim because the claim was duplicative of the breach of contract claim); *Jakobovits v. All. Life Ins. Co. of N. Am.*, No. 15 cv 9977, 2017 WL 3049538, at \*8 (S.D.N.Y. July 18, 2017) (same).

### III.    COUNTS FOUR AND FIVE

Count Four seeks turnover of unpaid distributions or other amounts owing to the members or liquidators of East End Ventures. Compl. ¶¶ 90-96. This count is brought against the Company and JAB SH. *See id.* Count Five seeks turnover of the Buyout Payment to East End Ventures. *Id.* ¶¶ 97-103. This count is brought against JAB SH and Bialsky. *See id.*

Counts Four and Five are brought pursuant to 11 U.S.C. § 542(a). Plaintiffs and Defendants now cross-move for summary judgment in their favor on Counts Four and Five.

### A.  Legal Standard

Section 542(a) of the Bankruptcy Code provides as follows:

> [A]n entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, or that the debtor may exempt under section 522 of this title, shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate.

11 U.S.C. § 542(a). "To prevail on a claim under section 542(a), the party seeking turnover must establish '(1) that the property is or was in the possession, custody or control of [another] entity during the pendency of the case, (2) that the property may be used . . . in accordance with § 363 or exempted by the debtor under § 522; and (3) that the property has more than inconsequential value or benefit to the estate.'" *In re CIL Ltd.*, No. 13-11272-JLG, 2024 WL 1693626, at *45 (Bankr. S.D.N.Y. Apr. 18, 2024) (quoting *In re McCaffrey*, No. 21-30891, 2023 WL 5612742, at *4 (Bankr. N.D.N.Y. Aug. 30, 2023)).

### B.  Summary of the Parties' Arguments

For the reasons discussed *supra* Discussion Section I.C., Plaintiffs maintain—and Defendants dispute—that they are entitled to the Buyout Payment and other amounts purportedly owing under the Sag Harbor Operating Agreement. *See* PMSJ at 22-23; DMSJ at 44-46.

### C.  Discussion

#### 1.  *Plaintiffs Cannot Seek Turnover Post-Confirmation.*

Courts have recognized that turnover claims cannot be brought post-confirmation. *See, e.g.*, *Penthouse Media Grp. v. Guccione (In re Gen. Media, Inc.)*, 335 B.R. 66, 75 (Bankr. S.D.N.Y. 2005); *In re Rickel & Assocs., Inc.*, 272 B.R. 74, 97 (Bankr. S.D.N.Y. 2002). This is because the bankruptcy estate ceases to exist, and there is no debtor-in-possession or trustee, after confirmation. *See In re Gen. Media, Inc.*, 335 B.R. at 75 (citations omitted) ("Once

32

confirmation occurs, there is no longer a trustee (*i.e.,* the debtor in possession) to whom property can be delivered, or an estate that can benefit. Furthermore, § 363 does not apply to a reorganized debtor. Consequently, a turnover proceeding under § 542 will not lie following confirmation."); *In re Rickel & Assocs., Inc.*, 272 B.R. at 98 (citations omitted) ("Since there is no estate and no trustee after confirmation, there can be no turnover.").

Here, the First Amended Plan in Debtor's bankruptcy case was filed on January 14, 2021. [Bankr. Dkt. No. 136.] The Court entered an order confirming the plan on March 17, 2021 [Bankr. Dkt. No. 149], and an order modifying the plan on May 19, 2021 [Bankr. Dkt. No. 166]. The Complaint in this adversary proceeding was filed on March 8, 2023—years after the plan was confirmed. [Dkt. No. 1.]

### 2.   *The Funds at Issue Are Not Undisputed.*

Counts Four and Five fail for an additional reason. "Turnover actions involve the return of undisputed funds." *In re Ladder 3 Corp.*, 571 B.R. 525, 530 (Bankr. E.D.N.Y. 2017) (citation omitted), *aff'd*, 768 F. App'x 146 (2d Cir. 2019) (summary order). "It is fundamental to a turnover claim that the subject property belongs to the estate." *In re CIL Ltd.*, 2024 WL 1693626, at \*45 (collecting cases); *see also generally Geron v. Peebler (In re Pali Holdings, Inc.)*, 488 B.R. 841, 851 (Bankr. S.D.N.Y. 2013) ("When the turnover power [under § 542] is properly invoked, it is simply an effort to recover property—or *on* property—that is *already* property of the estate. That, in turn, invokes the court's *in rem* jurisdiction over the bankruptcy *res*."). "The party seeking turnover bears the burden of proving, by a preponderance of the evidence, that the property in question is property to the estate." *In re CIL Ltd.*, 2024 WL 1693626, at \*45 (collecting cases). In other words, for "section 542(a) to apply, there must be no dispute that the property that is the object of the turnover claim is estate property." *Id.* (citation omitted). "A turnover claim is generally not a vehicle 'to adjudicate a debtor's underlying rights in property when ownership of that property is in

dispute.'" *Id.* (quoting *Bank of Am., N.A. v. Veluchamy (In re Veluchamy),* 879 F.3d 808, 816 (7th Cir. 2018)); *see also In re Brown*, No. 18-10617 (JLG), 2022 WL 4390454, at \*21 (Bankr. S.D.N.Y. Sept. 22, 2022) ("Congress envisioned the turnover provision of § 542 . . . to apply to tangible property and money *due to the debtor without dispute which are fully matured and payable on demand . . . .* [I]n order to state a claim for turnover of property under § 542, a plaintiff must allege . . . that the property is . . . the undisputed property of the bankruptcy estate.") (emphasis added) (internal citations omitted); *In re Gen. Media, Inc.,* 335 B.R. at 76 (citations omitted) ("Section 542(a) does not apply if title is disputed."). Notably, "turnover is a tool for 'the collection rather than the creation, recognition or liquidation of a matured debt.'" *In re CIL Ltd.*, 2024 WL 1693626, at \*45 (quoting *In re Fairfield Sentry Ltd. Litig.*, 458 B.R. 665, 683 (S.D.N.Y. 2011)). "In assessing whether there is a bona fide dispute sufficient to defeat a turnover claim, the bankruptcy court must 'determine whether there is an objective basis for either a factual or a legal dispute as to the validity of the debt.'" *Id.* at \*46 (quoting *Giuliano v. Fairfield Grp. Health Care Ctrs. Ltd. P'ship (In re Lexington Healthcare Grp., Inc.)*, 363 B.R. 713, 716 (Bankr. D. Del. 2007)).

The parties' voluminous briefing demonstrates that there is a bona fide dispute as to entitlement to the Buyout Payment and challenged distributions based on conflicting interpretations of the text of the Sag Harbor Operating Agreement. *See id.* at \*54 (noting that the court's "role [in deciding whether to dismiss the turnover claim] is only to decide whether there is a bona fide dispute" and granting defendants' motion for summary judgment dismissing turnover claim where "there plainly [was]" such a dispute).

For the reasons discussed above, the turnover action cannot be maintained and the Court grants Defendants' request for summary judgment as to Counts Four and Five.

### IV.    COUNTS ONE AND TWO

Count One is a demand for an accounting based upon Section 3.4 of the Sag Harbor Operating Agreement. Compl. ¶¶ 67-75. Count Two is a claim for equitable accounting. *Id.* ¶¶ 76-82. Plaintiffs and Defendants now cross-move for summary judgment in their favor on Counts One and Two.

### A.  Legal Standard

"An action for accounting may be a suit in equity, or it may be a particular remedy sought in conjunction with another cause of action." *Insured Advoc. Grp., LLC v. Spartan Servs. Corp.*, 23-cv-07212 (LJL), 2024 WL 3429131, \*7 (S.D.N.Y. July 16, 2024) (quoting *Brown v. Cooley Enters., Inc.*, No. 3:11–CV–0124–D, 2011 WL 2200605, at \*1 (N.D. Tex. June 7, 2011)). "If it is a separate, equitable cause of action, it is proper 'when the facts and accounts in issue are so complex that adequate relief cannot be obtained by law.'" *Id.* (quoting *Brown*, 2011 WL 2200605, at \*1).

To state a claim for equitable accounting under New York law, a plaintiff must establish "(1) relations of a mutual and confidential nature; (2) money or property entrusted to the defendant imposing upon him a burden of accounting; (3) that there is no adequate legal remedy; and (4) in some cases, a demand for an accounting and a refusal." *Eichenblatt v. Kugel*, No. 17-cv-559, 2018 WL 3202079, at \*7 (E.D.N.Y. May 15, 2018) (quoting *Associated Mortg. Bankers, Inc. v. Calcon Mut. Mortg. LLC*, 159 F. Supp. 3d 324, 338 (E.D.N.Y. 2016)). "The purpose of an equitable accounting is to require a fiduciary to show what he did with the principal's property." *Sigalit v. Kahlon*, No. 21-cv-8921 (AT), 2023 WL 5609099, at \*2 (S.D.N.Y. Aug. 30, 2023) (quoting *Soley v. Wasserman*, No. 08-cv-9262, 2013 WL 6388401, at \*4 (S.D.N.Y. Dec. 6, 2013)).

As to the first element of an equitable accounting claim, "a plaintiff must show either a fiduciary or confidential relationship with the defendant." *Eichenblatt*, 2018 WL 3202079, at \*7 (quoting *Calcon Mut. Mortg.*, 159 F. Supp. 3d at 339). Under New York law, a "confidential relationship" is a relationship that induces a plaintiff to entrust a defendant with money or property. *See Calcon Mut. Mortg.*, 159 F. Supp. 3d at 339 (quoting *KJ Roberts & Co. Inc. v. MDC Partners Inc.*, No. 12 Civ. 5779 (LGS), 2014 WL 1013828, at \*12 (S.D.N.Y. Mar. 14, 2014)). Moreover, a "fiduciary relationship arises when one has reposed trust or confidence in the integrity or fidelity of another who thereby gains a resulting superiority of influence over the first, or when one assumes control and responsibility over another." *Id.* (quoting *Faulkner v. Arista Records LLC*, 602 F. Supp. 2d 470, 482 (S.D.N.Y. 2009) (internal quotation marks omitted).

With respect to the third element of an equitable accounting claim, New York courts have held that an "equitable accounting claim cannot coexist with a breach of contract claim covering the same subject matter." *Najjar Grp., LLC v. West 56th Hotel LLC*, 14-CV-7120(RA), 2017 WL 819487, at \*3 (S.D.N.Y. March 1, 2017) (citations omitted); *see also Calcon Mut. Mortg.*, 159 F. Supp. 3d at 340 (quoting *Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F.Supp.2d 162, 207 (S.D.N.Y. 2011)) (same); *Herbert H. Landy Ins. Agency, Inc. v. Navigators Mgmt. Co.*, No. 14-cv-6298 (LGS), 2015 WL 170460, at \*2 (S.D.N.Y. Jan. 13, 2015) (dismissing a claim for accounting on the merits because the plaintiff's breach of contract claim covered the same subject matter); *Curtis v. Berutti*, 176 N.Y.S.3d 423, 434 (Sup. Ct. 2022) (citing *Physicians Mut. Ins. Co. v. Greystone Servicing Corp.*, No. 07 Civ. 10490 (NRB), 2009 WL 855648, at \*11 (S.D.N.Y. 2009)) (dismissing the equitable accounting claim because it "arose from the same operative facts" as did the breach of contract claim). "That is because a plaintiff would be able to obtain the information and

36

damages through discovery of his or her breach of contract claim, and thus, he or she has an adequate remedy at law." *Calcon Mut. Mortg.*, 159 F. Supp. 3d at 340 (citing *Gate Techs., LLC v. Delphix Cap. Mkts., LLC,* No. 12 Civ. 7075 (JPO), 2013 WL 3455484, at *8 (S.D.N.Y. July 9, 2013)).

The Second Circuit's decision in *Scholastic* is not contrary to this proposition. *See Najjar Grp.,* 2017 WL 819487, *4 (citing *Scholastic, Inc. v. Harris,* 259 F.3d 73 (2d Cir. 2001)). "In *Scholastic*, a former partner of a joint venture sought an accounting even though it had 'been given financial reports regarding the condition of the venture since the collaboration's inception.'" *Id.* (citing *Scholastic*, 259 F.3d at 90). The Second Circuit held that "[e]ven if Scholastic already possessed detailed financial information regarding the joint venture," the partner still had "an absolute right to an accounting." *Scholastic*, 259 F.3d at 90 (quoting *Koppel v. Wien, Lane & Malkin*, 125 A.D.2d 230, 234 (1st Dep't 1986)).  In an unpublished summary order, the Second Circuit clarified *Scholastic*'s interpretation of *Koppel* (which had found that "whenever there is a fiduciary relationship between the parties . . . there is an absolute right to an accounting notwithstanding the existence of an adequate remedy at law, 125 A.D.2d at 234) by narrowing *Koppel* "as standing either for the proposition that the *voluntary* transfer of financial documents or willingness to provide for an inspection or audit are no substitute for a judicially supervised accounting or that a principal is not precluded from *seeking* an equitable accounting merely because she *could* bring [but has not brought] an action at law." *Soley v. Wasserman,* 639 F. App'x. 670, 674 n.5 (2d Cir. 2016) (summary order) (quotation marks and internal citations omitted). The Second Circuit concluded that "New York law clearly requires that a principal demonstrate the unavailability of an 'adequate remedy at law' in order to prevail on a claim for an equitable accounting, *in*

37

*addition* to establishing the existence of a fiduciary relationship."[23] *Id. at* 674 (summary order) (emphasis in original) (citations omitted).

### B.  Summary of the Parties' Arguments

In their motion, Plaintiffs maintain that JAB SH and Bialsky are legally obligated to provide East End Ventures with an accounting of the Company's financial affairs, but that Defendants are "incapable of providing the accounting to which the Plaintiffs are entitled."[24] PMSJ at 23-24. Plaintiffs argue that "Defendants did not and cannot account for the costs of Units B and C," and that it is of no consequence that Defendants produced documents, as "an action for an accounting is not mooted by the production of financial documents." *Id.* at 23-24. Plaintiffs rely on Section 3.4 of the Sag Harbor Operating Agreement in asserting that

---

[23] This Court notes recent caselaw in New York that continues to repeat the proposition that where "there is a fiduciary relationship between the parties, there is an absolute right to an accounting notwithstanding the existence of an adequate remedy at law." *Mausner v. Mausner*, No. 23-cv-994 (JMF), 2024 WL 4758563, at *15 (S.D.N.Y. Sept. 26, 2024) (quoting *Webster v. Forest Hills Care Ctr., LLC*, 84 N.Y.S.3d 501, 503 (2d Dep't 2018); *see also Zohar v LaRock*, 185 A.D.3d 987, 991 (2d Dep't 2020); *Ull v Royal Car Park LLC*, 179 A.D.3d 469, 471 (1st Dep't 2020); *First Equity Realty v Harmony Grp., II*, 68 Misc.3d 1216(A), slip op. at *10-11 (Sup. Ct. N.Y. Cnty. Aug. 17, 2020) (holding the "mere existence of a fiduciary relationship gives rise to a claim for an accounting"). There does not appear to be controlling state law precedent from the New York Court of Appeals directly addressing this issue. *See generally Roslyn Union Free School Dist. v. Barkan*, 16 N.Y.3d 643, 653 (N.Y. 2011) (citation omitted) (noting an accounting claim is an "equitable remedy"); *Hastings v. H. M. Byllesby & Co.*, 293 N.Y. 413, 417 (N.Y. 1944) ("The debtor corporation could have obtained complete relief by an action at law . . . . No equitable accounting was necessary."); *Bosworth v. Allen*, 168 N.Y. 157, 165 (N.Y. 1901) (holding a court of equity could award relief in an action in equity for an accounting against directors who resigned as part of a conspiracy even "if part of the relief could be had in actions at law"); *Castoriano v. Dupe*, 145 N.Y. 250, 253 (N.Y. 1895) (holding that because the amount of a debt was disputed, the "plaintiff was not bound to peril his whole right by an adoption of the legal remedy, but was at liberty to redeem in equity where an accounting could be had and the ascertained debt be paid"). On the other hand, the United States Supreme Court has pointed out that the "necessary prerequisite to the right to maintain a suit for an equitable accounting, like all other equitable remedies, is . . . the absence of an adequate remedy at law." *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 478 (1962) (citing *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506 (1959)).

[24] In their motion, Plaintiffs requested that Defendants be bound by a "cost accounting" prepared by the Trustee based on the Company's books and records. *See* PMSJ at 25. Defendants highlighted that this relief differed fundamentally from the relief requested in the Complaint. *See* DMSJ at 46. As discussed *supra* note 10, the issue of the "cost accounting" was raised in connection with the parties' cross-motions for preclusion, which was resolved by stipulation that was so-ordered by the Court on August 20, 2024.

Defendants have committed a breach in their failure to provide an accounting. *See* Compl. ¶ 70.  Section 3.4 reads as follows:

> "Information". Each Member may inspect during ordinary business hours and at the principal place of business of the Company any and all books and records and any information or documentation respecting the Company, including but not limited to, the Certificate of Formation, the Operating Agreement, the minutes of any meeting of the Members and any tax returns of the Company.

SHOA § 3.4.

Defendants argue that Plaintiffs have not established that they are entitled to an accounting because they have not demonstrated that Defendants engaged in any wrongful conduct. *See* DMSJ at 46 (collecting cases). Defendants reiterate that they "have already provided Plaintiffs with over 21,000 pages of documents, which includes a full accounting," and argue that Plaintiffs have failed to demonstrate that the records provided are inaccurate. *Id.* at 47-48.  However, Defendants do not purport to deny that, as Manager of Sag Harbor, Bialsky owes fiduciary duties to minority members of the Company. *See generally* DMSJ. Defendants have also not denied that Plaintiffs entrusted Bialsky with money and property pursuant to this relationship. *See generally id.* Instead, Defendants argue (1) that Plaintiffs have not established that they are entitled to an accounting "because they have not demonstrated that Defendants engaged in any wrongful conduct"; and (2) that Defendants have already provided Plaintiffs with a full accounting. *Id.* at 46-47. Plaintiffs argue they have an "absolute right" to an accounting and that they need not establish wrongful conduct or a breach of fiduciary duty to assert that right. P. Opp. at 13.

### C.  Discussion

#### 1.  Count One

The plain language of Section 3.4 of the Sag Harbor Operating Agreement indicates that members have the right to inspect books and records respecting the Company. SHOA § 3.4. On its face, the Sag Harbor Operating Agreement does not indicate a right to obtain an accounting, which is not the same as an inspection of books and records. *See id.; Zyskind v. Facecake Marketing Techs., Inc.*, 973 N.Y.S.2d 34, 37 (1st Dep't 2013) (noting that "inspection of books and records" and the "furnishing of an annual balance sheet and profit and loss statement . . . are not the same as an accounting"); *see also Sigalit*, 2023 WL 5609099, at *3 (noting the "right to inspect company books and records is separate and independent from the right to an equitable accounting"). Even the right to inspect "any information or documentation respecting the Company" pursuant to section 3.4 of the SHOA is not the same as the right to a judicially supervised accounting. *See Soley*, 639 F. App'x. at 674 n.5 (summary order) (citing *Scholastic*, 259 F.3d at 90); *see also Najjar Grp.,* 2017 WL 819487, *4 (finding that the plaintiff "did receive the information it sought through 'judicially supervised' discovery in connection with its breach of contract claim, rather than through a voluntary transfer of records" from the defendant). Because Plaintiffs have failed to point to a provision in the Sag Harbor Operating Agreement establishing their right to an accounting, the Court grants summary judgment in favor of Defendants on Count One.

#### 2.  Count Two

It is undisputed that Bialsky, as Manager of Sag Harbor, owed a fiduciary duty to minority members of the Company and that Plaintiffs entrusted Bialsky with money and property pursuant to this relationship.  "Managing members of an LLC owe fiduciary duties to the minority members and thus can be compelled to account." *DPB Family LLC v. Eutychia*

40

*Group LLC*, No. 65255, 2018 WL 5043897, at *4 (Sup. Ct. N.Y. Cnty. Oct. 17, 2018) (citations omitted).

With respect to whether Plaintiffs need to establish wrongdoing to assert their equitable accounting claim, the Second Department has held that a plaintiff "must show that there was some wrongdoing on the part of a defendant with respect to the fiduciary relationship concerning property in which the plaintiff has an interest." *LMEG Wireless, LLC v. Farro*, 140 N.Y.S.3d 593, 598 (2d Dep't 2021) (internal quotation marks omitted) (quoting *Pacella v. RSA Consultants, Inc.*, 164 A.D.3d 806, 808 (2d Dep't 2018)); *see also Benedict v. Whitman Breed Abbott & Morgan*, 110 A.D.3d 935, 938 (2d Dep't 2013) (affirming dismissal of an equitable accounting cause of action where petitioners failed to prove any wrongdoing by the respondents with respect to their fiduciary roles as officers and directors of a corporation). On the other hand, the First Department has held that "[t]he right to an accounting is premised on the *relationship of the parties*" and that "[t]here is no requirement that there be any allegation of wrongdoing." *In re Garson*, 774 N.Y.S.2d 644, 646 (Sup. Ct. N.Y. Cnty. 2003) (citing *Morgulas v. J. Yudell Realty, Inc.*, 161 A.D.2d 211, 213-14 (1st Dep't 1990)); *see also Adam v. Cutner & Rathkopf*, 238 A.D.2d 234, 242 (1st Dep't 1997) (quoting *Morgulas*, 161 A.D.2d at 213-14) ("An allegation of wrongdoing is not an indispensable element of a demand for an accounting where the complaint indicates a fiduciary relationship between the parties or some other special circumstance warranting equitable relief.").

The Court finds it is unnecessary to reach the issue of whether Plaintiffs must establish wrongful conduct or a breach of fiduciary duty to sustain a claim for equitable accounting because Plaintiffs' claim for equitable accounting cannot coexist with their breach of contract claims covering the same subject matter. "New York courts have dismissed equitable accounting claims where, as here, the plaintiff asserts a breach of contract claim

41

seeking similar relief." *Calcon Mut. Mortg.*, 159 F. Supp. 3d at 340 (citing *Herbert H. Landy*, 2015 WL 170460, at *2). Here, the parties have gone through extensive discovery on the remaining claims, including claims for breach of contract covering the same subject matter as Plaintiffs' accounting claims. *See CSI Inv. Partners II, L.P. v. Cendant Corp.*, 507 F. Supp. 2d 384, 425-26 (S.D.N.Y. 2007) (granting summary judgment to defendant on plaintiffs' accounting claim because the plaintiffs already "sought money damages under their breach of contract claims, and because discovery [] already proceeded as to the measure of damages available to them should they prevail on those claims"). Plaintiffs have sought money damages in their breach of contract claims, *see* Compl. ¶¶ 89, 114, and the accounting claims and breach of contract claims arise from the same operative facts—rendering an accounting duplicative of the discovery in the breach of contract claims. *See Curtis*, 176 N.Y.S.3d at 435. For example, Count Six alleges "The East End Members are entitled to the payment of all amounts due under the Sag Harbor Operating Agreement, including all distributions (as against all Defendants), the Buyout Payment (as against JAB and Bialsky) and other amounts owed but not less than $25,784,025, to be determined at trial." Compl. ¶ 114. Count One alleges that, pursuant to the Sag Harbor Operating Agreement, Defendants are "obligated to provide an adequate and accurate accounting . . . of any distributions to which the East End Members are entitled," and Count Two alleges "Plaintiff is entitled to an equitable accounting of the payouts and other distributions of the Sag Harbor Project." Compl. ¶ 72, 82. Thus, Counts One, Two, and Six all implicate information related to the alleged buyout payment obligation to East End Ventures and distributions made to Defendants. *See Najjar Grp.,* WL 819487, *4 (holding that plaintiff's claim for accounting was duplicative of its breach of contract claim and subject to dismissal because the plaintiff supported "its proposed claim for accounting by alleging specific breaches of [the operating agreements]" and the plaintiff could obtain all the information it sought through its existing

42

claim at law "because discovery ha[d] already proceeded on the measure of damages available to [p]laintiff should it prevail on its breach of contract claim").

Because equitable accounting claims cannot coexist with breach of contract claims covering the same subject matter, the Court grants summary judgment in favor of Defendants on Count Two.

## V.    COUNTS THREE AND SEVEN

Count Three alleges breach of contract for refusing to permit review of the Company's books and records. *See* Compl. ¶¶ 83-89. This count is brought against Bialsky and JAB SH. *See id.* Count Seven, also brought against Bialsky and JAB SH, is a claim for breach of fiduciary duty. *See id.* ¶¶ 115-20. Plaintiffs allege that "Bialsky caused legal title to [the property located at 2 West Water Street] to be held by [JAB 2 West Water] despite the [Company's] entitlement to the Property" and that "Defendants breached their fiduciary duties by diverting the Property from [the Company]." *Id.* ¶¶ 116, 120. Defendants now move for summary judgment on Counts Three and Seven.

Defendants correctly observe that Plaintiffs failed to oppose Defendants' request for summary judgment on Counts Three and Seven. The Second Circuit has recognized that, "when a counseled party moves for summary judgment, 'a partial response [by the non-movant] arguing that summary judgment should be denied as to some claims while not mentioning others may be deemed an abandonment of the unmentioned claims.'" *Kovaco v. Rockbestos-Surprenant Cable Corp.*, 834 F.3d 128, 143 (2d Cir. 2016) (quoting *Jackson v. Fed. Exp.*, 766 F.3d 189, 195 (2d Cir. 2014)); *Jackson*, 766 F.3d at 196 (observing that "preparation of a response to a motion for summary judgment is a particularly appropriate time for a non-movant party to decide whether to pursue or abandon some claims or defenses" and "[a] partial response reflects a decision by a party's attorney to pursue some claims or defenses

43

and to abandon others")[25]; *see also LPD New York, LLC v. Adidas Am., Inc.*, No. 15-CV-6360 (MKB), 2022 WL 4450999, at \*27 (E.D.N.Y. Sept. 24, 2022) (citations omitted) ("Where a partial response to a motion [for summary judgment] is made— *i.e.*, referencing some claims or defenses but not others . . . in the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned.").

As noted in Defendants' reply, Plaintiffs opposed Defendants' request for summary judgment on all counts except Counts Three and Seven.[26] *See* D. Reply at 1. At the August 22 Hearing, Defendants again raised the issue of Plaintiffs' failure to oppose their request for summary judgment on these counts. *See* Aug. 22 Hr'g Tr. at 33:25-34:3 (wherein counsel for Defendants "point[s] out to the Court that in our motion for summary judgment, on the third and seventh counts of the complaint, there was no opposition to those counts, so those counts would certainly be granted as unopposed"). Counsel for Plaintiffs had the opportunity to respond at the hearing, yet did not address either of these counts. Therefore, the Court concludes that Plaintiffs have abandoned Counts Three and Seven and grants summary judgment in favor of Defendants.

---

[25] In *Jackson*, the Second Circuit highlighted the "relevant distinction to be drawn between fully unopposed and partially opposed motions for summary judgment in counseled cases." *See Jackson*, 766 F.3d at 196. Here, Plaintiffs filed a partial opposition to Defendants' cross-motion for summary judgment.

[26] The Court also notes that Plaintiffs moved for summary judgment on all counts except for Counts Three and Seven.

44

## CONCLUSION

For the reasons set forth above, the Court concludes as follows: (i) as to Count Six, Defendants' motion is granted and Plaintiffs' motion is denied; (ii) as to Count Eight, Defendants' motion is granted and Plaintiffs' motion is denied; (iii) as to Counts Four and Five, Defendants' motion is granted and Plaintiffs' motion is denied; (iv) as to Counts One and Two, Defendants' motion is granted and Plaintiffs' motion is denied; and (v) as to Counts Three and Seven, Defendants' motion is granted.



Dated: June 30, 2026
Central Islip, New York

Louis A. Scarcella
United States Bankruptcy Judge

45